**SECOND DIVISION**
**RICKMAN, P. J.,**
**GOBEIL and DAVIS, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**January 27, 2026**

# In the Court of Appeals of Georgia

A25A2164. MEJIA et al. v. SK BATTERY AMERICA INC. et al.

DAVIS, Judge.

In this wrongful death action, Daniella Mejia, as the personal representative of the estate of Cameron Bell, appeals from the trial court's grant of summary judgment in favor of SK Battery America, Inc. ("SKBA"), BrandSafway Solutions, LLC, Industrial Project Innovation, LLC ("IPI"), and Eastern Corporation. Because Bell assumed the risk of his injuries, we affirm.[1]

"We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." *9766, LLC v. Dwarf House, Inc.*, 331 Ga. App. 287, 288 (771 SE2d 1) (2015) (citation omitted).

---

[1] We thank the parties for their excellent oral arguments in this case.

So viewed, the record shows that Bell was a foreman overseeing electrical work at the construction site of an SKBA electric vehicle battery plant in Commerce, Georgia. He was an employee of non-party M. M. R. Constructor, Inc. ("MMR"). IPI oversaw several departments for the project, including safety. Eastern Corporation was the original general contractor, but IPI and SKBA eventually assumed the role traditionally filled by the general contractor. BrandSafway Solutions was the scaffolding and safety lifeline company that installed lifelines for the workers to tie-off.

In Bay 5 of the plant, there were 25 holes for the eventual installation of permanent HVAC vents and ducts. SKBA covered the holes with non-weight-bearing grilles or louvers that would fall to the ground if stepped on. As part of the site-safety plan, employees were required to remain 100% tied off when working over six feet above the ground. Bell received repeated training on this rule, and acknowledged the tie off requirement in writing.

While at work on October 23, 2020, Bell stood 20 feet away from another worker and witnessed that worker fall through one of the louvers in the ceiling. The worker survived because he was tied off. Bell texted a video of the incident to Mejia,

his girlfriend,[2] along with the comment, "[t]his job is dangerous af[.]" After that fall, above-ceiling work was suspended for about two weeks. MMR held safety meetings reiterating that 100% tie off was mandatory. While MMR lobbied to cover or reinforce the louvers, IPI rejected that plan. Instead, SKBA placed large red-taped X's over the louvers, with "Danger" written on the tape.

After the plant re-opened above-ceiling work, Bell's crew was assigned to perform above-ceiling work in Bay 5 on November 4, 2020. That morning, on a "job safety and environmental analysis worksheet," Bell identified falls as a potential hazard associated with the work and handwrote "100% [tie off]" as a mitigation for that hazard.

MMR kept a log of employees working on the ceiling. When Bell started to go up to the ceiling, the MMR logkeeper told him that MMR had not authorized anyone to go up. Bell reassured her that he had spoken with MMR and had permission. Bell was the first MMR employee above the ceiling that morning and the first MMR employee to go up since the shutdown. Bell, however, did not tie-off when he went up to the ceiling.

---

[2] Mejia contended that she was in a Texas common law marriage with Bell, but the trial court rejected that claim.

After Bell went up, other MMR employees followed, each tying off. When the employees saw Bell moving quickly without being tied off, they repeatedly warned him to tie off. But Bell replied that he was alright, and he told them, "hey, man, I'm good." Ultimately, the workers watched Bell step onto a red-taped, non-weight bearing louver. Bell fell over fifty feet, and he died two weeks later from the resultant injuries.

Mejia sued the defendants for wrongful death. The defendants moved for summary judgment, which the trial court granted on the basis that Bell assumed the risk of his injuries. This appeal followed.

In related enumerations of error, Mejia argues that the trial court erred in granting summary judgment because there was no evidence that Bell knew or should have known the dangers of falling through a louver. She contends that conditions had changed after the other employee's fall twelve days earlier, including the defendants' promise to reinforce the louvers and the removal of man-lifts intended to rescue workers. She argues that whether Bell exercised care for his safety was a question for the jury. We disagree.

Under "OCGA § 51-3-1, a landowner owes to an invitee a duty of ordinary care in keeping the premises and approaches safe, and a landowner may be liable for damages suffered by an invitee whose injuries were caused by the landowner's failure to exercise ordinary care in doing so." *SMG Constr. Servs., LLC v. Cook*, ___ Ga. ___ (922 SE2d 76) (2025), S25G0389, slip op. at 8 (Ga. Oct. 15, 2025) (quotations omitted). "[T]he true ground of liability is the landowner's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property." Id. (quotations omitted). "Thus, premises-liability litigation often turns on issues related to the knowledge of the hazard possessed by the defendant, the plaintiff, or both." Id., slip op. at 8-9.

Assumption of the risk is an affirmative defense and applies "when the plaintiff, with a full appreciation of the danger involved and without restriction of [his] freedom of choice either by the circumstances or by coercion, deliberately chooses an obviously perilous course of conduct." *Saulsbury v. Wilson*, 348 Ga. App. 557, 559 (1) (823 SE2d 867) (2019). A defendant asserting assumption of the risk must establish three elements: that the plaintiff "(1) had knowledge of the danger; (2) understood and

5

appreciated the risks associated with such danger; and (3) voluntarily exposed [himself] to those risks." Id. (citation and punctuation omitted).

"[Q]uestions related to the existence and extent of either party's knowledge should be decided as a matter of law only when the evidence of that knowledge is plain, palpable, and undisputed." *Cook*, slip op. at 11. Thus, assumption of the risk is not ordinarily subject to summary adjudication, except "where the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion" — that the plaintiff assumed the risk of his injuries. *Saulsbury*, 348 Ga. App. at 560(1).

In examining Bell's knowledge of the danger, this "requirement does not refer to a comprehension of general, non-specific risks. Rather, the knowledge that a plaintiff who assumes the risk must subjectively possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes injury." *Saulsbury*, 348 Ga. App. at 559–60(1).

Here, we conclude that the record conclusively established as a matter of law that Bell possessed actual knowledge of the specific, particular risk of harm. He witnessed another worker fall through a non-weight bearing louver a mere twelve days

before his own fall. And he witnessed what saved the worker — that the worker was tied-off when he fell.

The Supreme Court of Georgia's recent decision in *Cook* is particularly applicable to this case. In *Cook*, the plaintiff, "[w]hile working as an independent contractor installing cabinetry in a second-story bathroom of an active residential construction project ... fell from an exposed ledge resulting in serious injuries. At the time of his fall, [the plaintiff] was attempting to straighten an air hose while moving backward toward the exposed ledge he had previously observed outside the bathroom." *Cook*, slip op. at 1.

The Court held that the plaintiff "had actual knowledge of the specific hazard that was the proximate cause of his injuries," namely, the existence of an unguarded ledge. *Cook*, slip op. at 14-17. The Supreme Court vacated this Court's holding that the plaintiff only had knowledge of a "generally prevailing hazard," that is, the plaintiff's distance to the ledge. Id., slip op. at 15-16. The Court viewed the specific hazard as the unguarded ledge, not the plaintiff's proximity to the ledge where he was working. See id. ("[I]t was Cook's fall from, not his mere proximity to, the unguarded ledge that caused his injury."). Like the plaintiff in *Cook*, Bell possessed specific

knowledge of the hazard — the non-weight-bearing louvers — and not merely a generalized hazard from falling. See id.; see also *Saunders v. Indus. Metals & Surplus, Inc.*, 285 Ga. App. 415, 419–20 (3) (646 SE2d 294) (2007) (no genuine issue of material fact regarding plaintiff's knowledge of specific hazard where plaintiff knew of skylights but fell "because he miscalculated his distance to the hazard" before stepping backwards).

Mejia argues that conditions had materially changed since the worker's fall twelve days earlier. She contends that the defendants assured workers that the problem had been fixed and that they removed certain safety equipment. But the defendants gave no such assurances that the ceilings were safe to walk on and that the louvers had been reinforced. Instead, they reiterated to all workers that 100% tie off was necessary (which Bell acknowledged on the day of his fall) and marked the louvers with red danger X's. Compare *Baker v. Harcon, Inc.*, 303 Ga. App. 749, 753 (a) (i) (694 SE2d 673) (2010) (issue of fact existed on the plaintiff's knowledge of the hazard from falling into a trash chute where the appearance of the trash chute had changed and where there was a question as to whether the chute had been properly covered and/or marked). And while some details of Bay 5 had changed, "a plaintiff's misapprehension

8

of the precise details of a known hazard does not negate his actual knowledge of that hazard." *Cook*, slip op. at 16. See also id., slip op. at 16 n.5 ("actual knowledge requires awareness of the hazard, not a crystal ball").

The defendants have likewise established the second prong of the assumption of the risk test, namely, that Bell understood and appreciated the risks associated with such danger. After witnessing his coworker's fall, Bell texted Mejia that the job was dangerous. He also identified falling as a risk associated with his work and tying off as a remedy to that hazard. See *Liles v. Innerwork, Inc.*, 279 Ga. App. 352, 354 (2) (631 SE2d 408) (2006) ("We have repeatedly held that no danger is more commonly realized or risk appreciated than that of falling.") (citation modified).

Finally, Bell voluntarily exposed himself to the risk. It is true that we have held that an employer ordering an employee into a hazardous condition may constitute coercion so as to overcome this element of assumption of the risk. See *Baker*, 303 Ga. App. at 755–56. But unlike the plaintiff in *Baker,* Bell made the "deliberate choice to engage in obviously perilous conduct." Id. He went up to the ceiling despite being stopped by an MMR employee. He also refused to tie off against policy even when he was warned by his colleagues several times to do so. See *Muldovan v. McEachern*, 271

9

Ga. 805, 809 (2) (523 SE2d 566) (1999) (decedent, without coercion, assumed the risks in a game of Russian roulette when he told his friend to pull the trigger).

In summary, Bell "with a full appreciation of the danger involved and without restriction of [his] freedom of choice either by the circumstances or by coercion, deliberately cho[se] an obviously perilous course of conduct."[3] *Saulsbury*, 348 Ga. App. at 559 (1). While Bell's case is tragic, based on the evidence of record, the trial court did not err in granting summary judgment to the defendants in this case.

*Judgment affirmed. Rickman, P. J. and Gobeil, J., concur.*

---

[3] Given our reasoning above, we need not address the hired worker exception to an assumption of risk defense. See *Sinyard v. Ga. Power Co.*, 363 Ga. App. 195, 208 (2) (b) (871 SE2d 45) (2022) ("The hired worker exception is a narrow, specific expression of the doctrine of assumption of the risk" that "can apply when the property is an inherently and obviously unsafe area, such as a construction or demolition site, and the worker is hired to assist in the repair, construction, or demolition of the site." (quotation marks omitted)).